IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

UNITED STATES OF AMERICA      )
                              )
        v.                    )        CR 115-077
                              )
BRANDON CHARLES WRIGHT        )
EUGENE MICHAEL GROSS          )
_____

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
_____

Brandon Charles Wright and Eugene Michael Gross are two of sixteen defendants named in the Indictment, which alleges a drug distribution conspiracy involving marijuana, cocaine, and cocaine base.  Wright and Gross seek the suppression of evidence seized during court-authorized searches of their residences, arguing that affidavits submitted in support of the warrant applications failed to establish probable cause.  (Doc. nos. 169, 183.)  Having considered all arguments and evidence submitted by the parties, the Court hereby **REPORTS** and **RECOMMENDS** that the motions be **DENIED**.

## I.      FACTS ALLEGED IN AFFIDAVITS SUPORTING WARRANTS

On February 24, 2015, Jason Gustin, a Special Agent with the Federal Bureau of Investigation, submitted to U.S. District Court Judge J. Randal Hall an affidavit in support of warrant applications for eight residences.  (Affidavit of  SA Jason Gustin, doc. no. 169-2, ¶¶ 6, 106.)  Defendant Gross contends that SA Gustin failed to establish probable cause for a search of his residence at 429 Utley Road, Waynesboro, Georgia.  Defendant Wright makes

the same contention with respect to the search of his residence at 1446 Goins Road, Wrightsville, Georgia.

SA Gustin begins his affidavit by describing his experience in drug investigations, his knowledge of drug distribution methodology and networks, and his experience with wiretaps in drug investigations. (Id., ¶¶ 3-4.) SA Gustin next explains that, upon receiving two tips from confidential sources, the FBI began investigating drug trafficking activities within Jefferson County in March 2014. (Id.,¶ 9.) The investigation soon focused on Defendants Melvin Howard and Jerome Flournoy as being the alleged "primary sources of supply for cocaine and marijuana throughout Jefferson, Burke, Emmanuel, and Washington Counties." (Id.) After purportedly completing ten controlled purchases of marijuana and cocaine, six of which involved Howard or Flournoy as the alleged seller, Task Force Officer Mark Bryngelson applied for and received authorization to conduct wiretaps on four phones belonging to Howard and Flournoy. (Id., ¶ 10; see Ex. 2, 3.) The affidavits submitted by TFO Bryngelson when seeking the wiretap authorizations are incorporated by reference into SA Gustin's affidavit. (Id., ¶ 7.) In seeking the residential search warrants at issue, SA Gustin relied on the controlled purchases and wiretapped phone conversations to establish probable cause.

### A. Probable Cause Allegations Concerning Gross and His Residence

SA Gustin's affidavit details an alleged phone conversation between Howard and Gross on January 26, 2015, wherein Gross states his intention to "try and get one from you a little later on" and that he "would like to try to get it this evening . . . ." (Id., ¶ 50.) SA Gustin interprets these statements as referring to Gross's interest in purchasing one ounce of

cocaine from Howard. (Id., ¶ 51.) Just seven hours after this phone conversation, the affidavit alleges, Howard drove thirty-two minutes from his residence and met Gross on the side of the road in Midville, Georgia for less than three minutes. (Id., ¶ 53.)

When Gross left that meeting with Howard, investigators observed him driving on Lawson Road in the direction of his residence at 429 Utley Road. (Id., ¶ 53.) Investigators could not surveil Gross any farther because Lawson Road is a rural dirt road that dead-ends into Utley Road, which has very few houses and ends near Gross's residence. (Id., ¶ 53.) Investigators determined that 429 Utley Road is Gross's residence through the Georgia Department of Driver Services, Gross's car registration, Gross's former probation officer, and observations of his car in the vicinity of that address. (Id., ¶ 58.)

Just five days after their roadside meeting, on January 31, 2015, Gross purportedly called Howard and stated "I'm gonna try . . . I got some change for you. I'm going to bring you that change I got, but, shoot, I still got 7 or 8 of them things." (Id., ¶ 54.) Howard replied that an unidentified male had called him "and said we were supposed to have some 'pop' by Tuesday. He coming down." (Id.) Gross responded that he "need[ed] to hurry-up and pop that motherfucking popcorn because them jokers there, boy." (Id.) By this time, as the affidavit alleges, "[i]nvestigation had revealed that 'Pop' or 'popcorn' is slang used within the organization to refer to marijuana." (Id., ¶ 55.) SA Gustin interprets the conversation as Gross stating that he has seven or eight pounds of marijuana left to sell and wants to sell it quickly so that he can buy more from Howard. (Id.; See ex. 2, ¶ 36.) Two days after this conversation, on February 2, 2015, Howard called Gross to state his intention

of visiting Gross at his residence, and investigators followed Howard to Lawson Road near Gross's residence on Utley Road.  (Id., ¶¶ 56-57.)

Based on this information concerning Gross's alleged interactions with Howard, SA Gustin concludes in the affidavit "there is a reason to believe that EUGENE GROSS is involved in the distribution of illegal drugs and that his activities are ongoing.  Additionally, there is reason to believe that GROSS resides at 429 Utley Road, Waynesboro, Georgia, and that the residence likely contains evidence and fruits of those illegal activities."  (Id., ¶ 59.)

With respect to the latter conclusion that Gross likely stores evidence and fruits of the alleged activities at his residence, SA Gustin devotes eleven paragraphs at the end of his affidavit to (1) describing the trove of items typically utilized by traffickers in the operation of an illegal drug trade, including scales, packaging, ledgers, cash, and bank statements; and (2) explaining that traffickers often maintain these items in a private location to which they have ready access, including their residences.  (Id., ¶¶ 94-105.)

**B.      Probable Cause Allegations Concerning Wright and His Residence**

SA Gustin begins his discussion of Wright with the general allegation that Howard supplies marijuana to Wright, and that Wright is "a known distributor [of] marijuana that operates primarily in Johnson and Washington Counties."  (Id., ¶ 85.)  SA Gustin then alleges interception of the following, cryptic phone conversation between Howard and Wright at approximately 8:16 p.m. on February 10, 2015:

Wright:      Do I need to go on to bed and wake up in the morning?

Howard:       Yeah.  Just wake on up in the morning, man, because they got to unload

and, you know, I just talked to them.  He said they got to unload and

everything.  So, I said alright, then I will just see ya'll in the morning.

Wright:       Yeah.  We will just get together in the morning.

(Id., ¶ 86.)   SA Gustin interprets this conversation as Howard telling Wright "that his

supplier had a new load of marijuana, but it would not be ready for Howard to pick-up until

the following day."  (Id., ¶ 87.)

The following morning, investigators allegedly observed Howard driving three hours

and thirty-six minutes from his residence in Wadley, Georgia to a storage facility in Lithonia,

Georgia.  (Id., ¶ 88.)  He purportedly spent a total of five minutes in the storage facility, then

made the long drive back home.  (Id.)  Soon after leaving the facility, Wright allegedly called

Howard and investigators intercepted the following, cryptic conversation.

Howard:       I got you back dog.

Wright:       You going to the movies?

Howard:       Yeah.

Wright:       Popcorn?

Howard:       Come on man.  You know I didn't open this shit.

(Id., ¶ 89.)   Taking into account the investigators' determination that the drug organization

purportedly uses the phrase "popcorn" as a code word for marijuana, SA Gustin interprets

this conversation as Wright asking Howard to confirm that he received the anticipated supply

of marijuana and that it is of high quality.  (Id., ¶ 90.)  Howard responds that he has not

opened the marijuana.  (Id.)

The affidavit also details a home visit to Wright by Senior Parole Officer Mark Bryngelson at 1446 Goins Road, Wrightsville, Georgia. (Id., ¶ 91.) Notably, as stated above, Officer Bryngelson was also a task force officer that submitted affidavits supporting the four wiretap applications. During the home visit, Officer Bryngelson observed an expanded steel door covering the main entrance to Wright's residence and security cameras along the outside of the residence, a mobile home. (Id., ¶ 92.) SA Gustin alleges in the affidavit that "[t]his added security is common among individuals involved in the trafficking of illegal drugs." (Id.)

Based on this information concerning Wright's involvement with Howard and his elaborate home security, SA Gustin concludes in the affidavit "there is reason to believe that BRANDON WRIGHT is actively involved in the distribution of illegal drugs, that he currently resides at 1446 Goins Road, Wrightsville, Georgia, and that there is likely evidence and fruits of those illegal activities at his residence." (Id., ¶ 93.) As with Gross, additional support for the latter conclusion that Wright likely stores items related to drug trafficking at his residence can be found in the final eleven paragraphs of the affidavit, wherein SA Gustin describes the trove of items typically utilized by traffickers and explains that traffickers often maintain these items in their residences. (Id., ¶¶ 94-105.)

## II.    DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to

be seized." U.S. Const. amend. IV. Thus, a search warrant must: (1) be based on probable cause; (2) be supported by a sworn affidavit; (3) particularly describe the place to be searched; and (4) particularly describe the items to be seized. Groh v. Ramirez, 540 U.S. 551, 557 (2004). The Fourth Amendment itself does not preclude the use of illegally seized evidence. Nevertheless, evidence seized in violation of the Fourth Amendment is generally excluded from trial. United States v. Leon, 468 U.S. 897, 905 (1984).

Defendants do not contest that the search warrants at issue satisfy three of the four basic requirements of the Fourth Amendment, in that they are supported by sworn affidavits, particularly describe the places to be searched, and particularly describe the items to be seized. Defendants argue that the warrants are not based on a fair probability that contraband or evidence of a crime would be found at their residences because (1) there is no direct evidence of either Defendant buying illegal drugs from Howard; and (2) the only fact suggesting contraband or evidence might be found is that they live at these places. (Doc. no. 169, p. 6; doc. no. 183, pp. 3-5.) As explained in detail below, the supporting affidavits satisfy the probable cause requirement.

A.   The Meaning of Probable Cause

 In deciding whether to sign a search warrant, the issuing judge is "'simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). In this regard,

"'probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts[.]'" <u>United States v. Brundidge</u>, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting <u>Gates</u>, 462 U.S. at 232).

For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determination." <u>United States v. Miller</u>, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing <u>Gates</u>, 462 U.S. at 236-37; <u>United States v. Ventresca</u>, 380 U.S. 102, 109 (1965)). In reviewing the issuance of the search warrant, the undersigned must determine only that the judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant. <u>See</u> <u>Gates</u>, 462 U.S. at 238; <u>see also</u> <u>Massachusetts v. Upton</u>, 466 U.S. 727, 728 (1984). The validity of the warrant is considered based on the totality of the circumstances. <u>See</u> <u>Brundidge</u>, 170 F.3d at 1352.

**B.      The Affidavits Establish Probable Cause to Believe that Gross and Wright Were Buying Illegal Drugs For Distribution from Howard, and that Evidence Would Be Found At Their Residences.**

The affidavits provided a substantial basis for the District Judge's finding of probable cause that Howard, Gross, and Wright were involved in the illegal distribution of drugs. SA Gustin first establishes a fair probability that Howard is an illegal drug distributor by recounting three large, controlled purchases of cocaine and marijuana from him by confidential sources. (Gustin Aff., ¶ 10.) The affidavit then describes two cryptic phone conversations between Gross and Howard, on January 26 and 31, 2015, where it is clear that

Gross is buying items from Howard that neither of them is comfortable discussing on the phone. (Id., ¶¶ 50, 52-54.) Instead, Gross talks about "buying one" from Howard, and of needing to "pop that . . . popcorn." (Id., ¶ 54.) Following both conversations, Howard and Gross drive long distances to meet in person, the first time on the roadside for three minutes and the second time at Gross's residence. (Id., ¶¶ 53, 57.) It is well within the realm of fair probability and common sense to infer illegal drug transactions between Gross and Howard.

The same is true of Wright. Common senses suggests that, in the intercepted conversation on February 10, 2015, Howard has just received a shipment of illegal drugs, Wright is eager to buy some of the shipment, and Howard is instructing him to wait until the next morning because the drugs need to be unloaded. (Id., ¶¶ 86-87.) The next day, Wright drives more than three hours from his home to spend five minutes inside a storage facility, then receives a call from Wright on his return trip to discuss "the movies" and "popcorn." (Id., ¶¶ 88-89.) These conversations establish a fair probability that Howard was supplying illegal drugs to Wright, especially when considered along with the three, prior controlled purchases of illegal drugs from Howard by confidential sources.

The affidavits also provide a substantial basis for the District Judge's determination of a fair probability that evidence of drug trafficking would be found at the homes of Wright and Gross. Indeed, in the closing paragraphs of his affidavit, SA Gustin explains in detail the trove of items typically used by traffickers in the operation of their illegal drug trades, and that traffickers often store these items in private locations such as their residences. (Id., ¶¶ 94-105.) In addition, SA Gustin describes Wright's residence as having a reinforced steel-framed door and security cameras along the perimeter, and explains that such extra security

is common among individuals involved in the trafficking of illegal drugs. (Id., ¶ 92.)  As to

Gross, investigators observed him travelling to his home immediately after his mysterious,

three-minute meeting on the roadside with Howard on January 26, 2015.  (Id., ¶ 53.)  In

addition, Howard drove to Gross's residence on February 2, 2015, just two days after their

cryptic phone conversation about an anticipated delivery to Howard of "popcorn" and

Gross's need to hurry up and "pop" that "popcorn."  (Id., ¶¶ 53-54.)  This information as to

both defendants is more than sufficient to satisfy the Fourth Amendment's requirement of

probable cause.

Where, as here, a defendant contends there is no nexus between the items being

sought and the residence of a defendant, "the affidavit must supply the authorizing magistrate

with a reasonable basis for concluding that Defendant might keep evidence of his crimes at

his home, i.e., a 'safe yet accessible place.'"  United States v. Kapordelis, 569 F.3d 1291,

1310 (11th Cir. 2009) (quoting United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999)).

The court in Kapordelis further stated in connection with searching a suspect's home:

> "The justification for allowing a search of a person's residence when that
> person is suspected of criminal activity is the common-sense realization that
> one tends to conceal fruits and instrumentalities of a crime in a place to which
> easy access may be had and in which privacy is nevertheless maintained.  In
> normal situations, few places are more convenient than one's residence for use
> in planning and hiding fruits of a crime."

Id. (quoting United States v. Green, 634 F.2d 222, 226 (5th Cir. 1981)).

Therefore, while the affidavit must establish a link between the defendant and the

residence to be searched as well as between the residence and criminal activity, "[t]here need

not be an allegation that the illegal activity occurred at the location to be searched . . . ."  Id.;

see also <u>United States v. Anton</u>, 546 F.3d 1355, 1358 (11th Cir. 2008) (holding that evidence of defendant possessing contraband of type normally expected to be hidden in residence will support search); <u>United States v. Jenkins</u>, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (finding that nexus between items to be seized and defendant's residence can be established circumstantially if contraband is capable of being hidden therein). SA Gustin established a nexus between each defendant and his residence that is more than sufficient under this liberal standard, as explained above.

Defendants rely on <u>United States v. Lockett</u>, 674 F.2d 843 (11th Cir. 1982), which found probable cause to be lacking with regard to a warrant authorizing the search of a residence for dynamite and blasting caps allegedly stored at the residence, an improper storage facility, in violation of 18 U.S.C. § 842(j). <u>Id.</u> at 844. The affidavit in that case alleged that (1) Lockett had purchased a case of dynamite; (2) he was a disgruntled former employee of a telephone company against which he had made implied threats and mentioned explosives; (3) a bomb made of the same common type of dynamite purchased by Lockett was found at the telephone company sixty miles from Lockett's residence; and (4) no proper storage facilities were observed at Lockett's residence. <u>Id.</u> at 846. In addition, the affidavit described no facts to support that the residence was indeed Lockett's residence. <u>Id.</u> at n.5. The Eleventh Circuit held that the affidavit did not provide probable cause for the search because "[t]he fact that Lockett may have placed a bomb next to a building some 60 miles from Sweetwater is not enough. Without some showing that dynamite was being stored at the Sweetwater address, the evidence is insufficient to support a finding of probable cause." <u>Id.</u> at 847.

Lockett is not controlling for two reasons. First, as explained above, SA Gustin's affidavit establishes a fair probability that evidence concerning drug trafficking would be found at the homes of Wright and Gross. Second, the more relevant cases from the Eleventh Circuit are Kapordelis, 569 F.3d at 1310, and Anton, 546 at 1358 because they recognize the obvious likelihood of a suspect hiding in their home contraband that is capable of being hidden there.

**C.      Even If The Affidavits Did Not Establish Probable Cause To Search The Two Residences, Which They Did, The Leon Good Faith Exception Applies.**

Even if probable cause did not exist to search both residences, the good faith exception to the exclusionary rule applies under United States v. Leon, 468 U.S. 897, 902 (1984). Defense counsel argued at the hearing that this exception does not apply because the warrants were so lacking in indicia of probable cause as to render official belief in their existence entirely unreasonable. See Leon, 468 U.S. at 923. But the warrants and supporting affidavits at issue here are far more than mere "bare-bone" statements of conclusory allegations. United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998). The officers did not act unreasonably in relying on the determination by the District Judge that probable cause existed to believe that both Defendants were engaged in illegal drug activity and the fruits of such activity would likely be contained within their residences.

### III.     CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Defendants Gross' and Wright's motions to suppress be **DENIED**.  (Docs. no. 169, 183.)

SO REPORTED and RECOMMENDED this 4th day of December, 2015, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA